# United States Court of Appeals for the Federal Circuit

---

**ARRIS GROUP, INC.,**
*Plaintiff-Appellant,*

v.

**BRITISH TELECOMMUNICATIONS PLC,**
*Defendant-Appellee.*

---

2010-1292

---

Appeal from the United States District Court for the Northern District of Georgia in case no. 09-CV-0671, Judge Charles A. Pannell, Jr.

---

Decided: May 19, 2011

---

JOHN M. DIMATTEO, Willkie Farr & Gallagher, LLP, of New York, New York, argued for plaintiff-appellant. With him on the brief were EUGENE L. CHANG and MARC E. MONTGOMERY.

JAMES H. SHALEK, Proskauer Rose, LLP, of New York, New York, argued for defendant-appellee. With him on the brief were NOLAN M. GOLDBERG and THEODORE K. CHENG.

---

Before RADER, *Chief Judge*, NEWMAN and DYK, *Circuit Judges*.

DYK, *Circuit Judge*.

Arris Group, Inc. ("Arris") brought suit against British Telecommunications, PLC ("BT") seeking a declaratory judgment that claims in BT's patents—U.S. Patent Nos. 5,142,532 ("'532 patent"); 5,526,350 ("'350 patent"); 6,538,989 ("'989 patent"); and 6,665,264 ("'264 patent") (collectively the "patents-in-suit")—are invalid and not infringed by Arris. Arris also sought an injunction preventing BT from suing Arris or its customers for infringement of the patents-in-suit. The United States District Court for the Northern District of Georgia dismissed for lack of subject matter jurisdiction, finding that there was no Article III case or controversy between the parties. *Arris Group, Inc. v. British Telecomm., PLC*, No. 1:09-CV-671-CAP, slip op. at 5–8 (N.D. Ga. Feb. 18, 2010). Because we conclude that an actual controversy existed between Arris and BT, we reverse the district court's decision and remand for further proceedings.

## BACKGROUND

The patents-in-suit claim systems and methods that relate in particular to cable networks that offer Voice over Internet Protocol ("VoIP") telephone services. Plaintiff-Appellant Arris develops and manufactures cable telephony and data products for cable system operators for use in VoIP systems. This declaratory judgment action stems from BT's allegations that Cable One, Arris' customer, has infringed the patents-in-suit by using equipment purchased from Arris to implement VoIP services on Cable One's network.

VoIP is a communications protocol under which voice data is transmitted over a packet-switched network such as the internet, rather than over the traditional Public Switched Telephone Network ("PSTN"). To originate a VoIP telephone call, the analog voice signal must first be digitized and encoded into packets. In Cable One's network, this essential function is performed by devices sold by Arris known as Embedded Multimedia Terminal Adapters ("E-MTAs"). An E-MTA is a user-end device that combines a Cable Modem ("CM") and a Multimedia Terminal Adapter ("MTA") to allow for the connectivity of both Ethernet-compatible devices and traditional analog telephones. The MTA converts the telephone's analog voice signal into digital IP packets, delivers a dial tone, and manages other essential call functions.

In addition to E-MTAs, Cable One's VoIP network uses other Arris products known as Cable Modem Termination Systems ("CMTSs"). A CMTS is an electronic device, typically used at a cable company's head-end or hub-site, which communicates with multiple subscribers' cable modems and routes traffic to and from the internet. The use of CMTSs in Cable One's network is essential to the functionality of its VoIP services. Cable One's network and Arris' CMTS and E-MTA products all operate in accordance with the industry standards of (1) Data Over Cable Service Interface Specification ("DOCSIS"), which defines interface standards for cable modems and supporting equipment; and (2) PacketCable, which is an extension of DOCSIS used for VoIP.

On July 17, 2007, BT sent a letter to Cable One that accused Cable One's VoIP network of infringing various claims of the patents-in-suit and sought to begin licensing

negotiations.[1]  The specified claims included both system and method claims.  In response to BT's letter, Cable One requested on August 15, 2007, that it be provided a "specific comparison of the claims of [the patents-in-suit] to our cable systems or operations."  J.A. 159.  On August 23, 2007, BT sent Cable One a 118-page presentation showing "the applicability of selected claim elements in the four BT patents to Cable One's services."  J.A. 177; 178–295.  The presentation specifically and repeatedly identified Arris' CMTSs and E-MTAs used in Cable One's network as embodying numerous elements and performing numerous method steps of the asserted claims.  BT and Cable One subsequently met on October 23, 2007, at Cable One's offices in Phoenix, Arizona, where BT reviewed the 118-page presentation and further explained its infringement contentions.

Following the October 23 meeting, Cable One sent a letter to Arris in November 2007 notifying Arris of BT's infringement accusations.  Cable One additionally demanded in the letter that Arris "defend, indemnify and hold harmless Cable One from these assertions of infringement."  J.A. 588.

On January 18, 2008, BT "proposed . . . a face-to-face meeting with Cable One and its vendors . . . to determine if we have a basis for further licensing discussions."  J.A. 301.  In late February 2008, Cable One requested that Arris be included in the next meeting.  The meeting was

---

[1]  BT's letter additionally indicated that IPValue, an independent contractor licensing firm, would act as BT's agent to conduct its licensing negotiations with Cable One.  Subsequent meetings and negotiations with Cable One and Arris were conducted by IPValue on BT's behalf.  For convenience, we refer in this opinion to the actions and communications of IPValue and its agents as having been conducted by BT.

held on March 14, 2008, at Arris' office in Suwanee, Georgia. During the meeting, BT presented the same 118-page presentation of BT's infringement contentions that it had presented to Cable One at the Phoenix meeting.

The parties—including Arris—met again at Arris' Suwanee office on August 29, 2008, where they discussed potential licensing for Cable One. At the meeting, Arris presented a response to BT's infringement contentions. Arris contended that certain relevant claim limitations were not met by Arris' CMTS or E-MTA products used in Cable One's network. *See* J.A. 730, 740–41, 749, 751, 760–61.

Following the August meeting, BT requested that Arris send "formal rebuttal information" regarding its infringement contentions, J.A. 590, and it further requested a telephone conference with the parties' "technical people," J.A. 592. On September 17, 2008, Arris sent BT further materials containing its non-infringement arguments, seeking to absolve Cable One of infringement by demonstrating how components within Cable One's network did not meet one or more of the limitations in the claims-at-issue. Two conference calls took place thereafter on September 24, 2008, and November 13, 2008, during which Arris presented its non-infringement arguments and BT responded to them.

On November 24, 2008, BT requested that both Arris and Cable One agree to receive a specific licensing proposal under the terms of a nondisclosure agreement BT had entered into with Cable One. Arris and Cable One agreed, and on December 15, 2008, BT sent copies of its licensing proposal to both parties. The proposed licensing agreement explicitly stated that the license would be

"granted to Cable One only." J.A. 336. No license agreement was consummated.

On March 31, 2009, Arris filed this declaratory judgment action in the United States District Court for the Northern District of Georgia, seeking: (1) a declaration that Arris does not infringe the patents-in-suit; (2) an injunction preventing BT from instituting infringement actions against Arris or its customers; and (3) a declaration that the patents-in-suit are invalid. The district court found that there was no Article III case or controversy between Arris and BT, because throughout the parties' meetings and conversations, BT "only discussed Cable One's infringement and did not discuss any infringement by Arris." *Arris*, slip op. at 3; *see also id.* at 2, 4, 6–7. In the district court's view, "the defendant's actions [were] directed [solely] toward Cable One, Arris' customer, rather than Arris itself," which the court found "[did] not constitute a real and immediate injury for Article III jurisdiction." *Id.* at 7–8. The court accordingly dismissed Arris' declaratory judgment action for lack of subject matter jurisdiction. *Id.*

Arris appealed the district court's decision to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

We review the district court's dismissal for lack of subject matter jurisdiction de novo. *Air Measurement Techs. Inc. v. Akin Gump Strauss Hauer & Feld, LLP*, 504 F.3d 1262, 1267 (Fed. Cir. 2007). A party has standing to bring an action under the Declaratory Judgment Act if an "actual controversy" exists, 28 U.S.C. § 2201(a), which "is the same as an Article III case or controversy." *Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*, 482 F.3d 1330, 1338 (Fed. Cir. 2007) (citing *Aetna Life Ins. Co. v.*

*Haworth*, 300 U.S. 227, 239–41 (1937)).  The burden is on the party claiming declaratory judgment jurisdiction to establish that an Article III case or controversy existed at the time the claim for declaratory relief was filed.  *King Pharm., Inc. v. Eon Labs, Inc.*, 616 F.3d 1267, 1282 (Fed. Cir. 2010); *Benitec Austl., Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1344 (Fed. Cir. 2007).

I

This case again presents a question of standing to bring a declaratory judgment action for a determination of non-infringement and invalidity.  In *MedImmune, Inc. v. Genentech, Inc.*, the Supreme Court rejected our prior, more stringent standard for declaratory judgment standing insofar as it required a "reasonable apprehension of imminent suit."  549 U.S. 118, 132 n.11 (2007); *see also ABB Inc. v. Cooper Indus., LLC*, No. 2010-1227, 2011 WL 553603, at \*2 (Fed. Cir. Feb. 17, 2011) (recognizing *MedImmune*'s rejection of the reasonable apprehension test); *Teva Pharm.*, 482 F.3d at 1338–39 (same); *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1378–79 (Fed. Cir. 2007) (same).  Under the Court's new standard, an Article III case or controversy exists when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127 (internal quotation marks and citation omitted).  The dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests," such that the dispute is "real and substantial" and "admi[ts] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."  *Id.* (internal quotation marks and citation omitted).

Arris contends that it has standing and that there is an Article III case or controversy simply because it has suffered economic injury as a result of infringement threats made by BT against Arris' customer Cable One. This, says Arris, creates a risk that Cable One will cease purchasing Arris' CMTS and E-MTA products for its VoIP operations. While economic injury may confer standing in cases challenging government action,[2] we have not held that economic injury alone is sufficient to confer standing in patent cases seeking a declaratory judgment. Indeed, in patent cases before the Supreme Court's decision in *MedImmune*, the regional circuits and our court held that economic injury is not alone sufficient to confer standing.[3]

---

[2]  *See Craig v. Boren*, 429 U.S. 190, 194–95 (1976) (allowing beer vendor to raise equal protection rights of its male customers to buy beer at same age as females, because discriminatory law caused economic injury to vendor by constricting its market); *see also, e.g., Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 286–87 (1997) (in-state natural gas consumer who suffered economic injury from state tax that allegedly discriminated against out-of-state sellers had standing to bring Commerce Clause challenge); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 681–83 (1977) (corporate seller of contraceptives had standing to challenge statute prohibiting sale of contraceptives to persons under 16 years of age); *Totes-Isotoner Corp. v. United States*, 594 F.3d 1346, 1352 (Fed. Cir. 2010) (importer of leather gloves had standing to challenge government's imposition of different tariff rates for men's and women's gloves; though importer was not the subject of the alleged discrimination, its economic injury was sufficient to confer standing).

[3]  *See, e.g., Microchip Tech. Inc. v. Chamberlain Grp., Inc.*, 441 F.3d 936, 943 (Fed. Cir. 2006) (holding that, where sole injury alleged was economic harm to declaratory plaintiff caused by patentee's purported threatening of its customers, "[s]uch an economic interest alone . . . cannot form the basis of an 'actual controversy' under the Declaratory Judgment Act."); *Aralac, Inc. v.*

*MedImmune* did not abandon this rule. To the contrary, *MedImmune* adopted an "adverse legal interest" requirement. *See MedImmune*, 549 U.S. at 126–27 (requiring the dispute to "touch[ ] the legal relations of parties having *adverse legal interests*" and summarizing the question of declaratory judgment jurisdiction as "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having *adverse legal interests*, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment") (emphases added). An "adverse legal interest" requires a dispute as to a legal right—for example, an underlying legal cause of action that the declaratory defendant could have brought or threatened to bring.[4] In the absence of a controversy as to a legal right, a mere adverse *economic* interest is insufficient to create declaratory judgment jurisdiction. Although economic injury alone is insufficient to create standing, we nonetheless conclude that Arris has standing based on other well-established standards.

---

*Hat Corp. of Am.*, 166 F.2d 286, 295 (3d Cir. 1948) ("Where a person is not engaged in possible infringing conduct . . . he lacks an interest in a controversy to support an action for declaratory judgment relief to test the validity of a patent. . . . An economic interest is not enough to create justiciability.").

[4] A controversy as to a legal right may also arise in some cases where the declaratory defendant has no cause of action. *See Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*, 527 F.3d 1278, 1291–94 (Fed. Cir. 2008) (finding a controversy as to a legal right where, despite patentee's covenant not to sue, the Hatch-Waxman Act's framework deprived generic drug maker of the legal right to market its drug absent a judicial finding that the listed patent was invalid or not infringed); *see also Teva Pharm. USA, Inc. v. Eisai Co., Ltd.*, 620 F.3d 1341, 1346–48 (Fed. Cir. 2010) (same).

We have recognized that, where a patent holder accuses customers of direct infringement based on the sale or use of a supplier's equipment, the supplier has standing to commence a declaratory judgment action if (a) the supplier is obligated to indemnify its customers from infringement liability, or (b) there is a controversy between the patentee and the supplier as to the supplier's liability for induced or contributory infringement based on the alleged acts of direct infringement by its customers.[5] Though there was no express indemnification agreement here, Arris contends it risks being held liable to Cable One for indemnification under Georgia's Uniform Commercial Code ("UCC"). *See* Ga. Code § 11-2-312(3); *see also WS Packaging Grp., Inc. v. Global Commerce Grp., LLC*, 505 F. Supp. 2d 561, 566 (E.D. Wis. 2007) (holding that, under Wisconsin's UCC, Wis. Stat. § 402.312(3), a customer without an indemnity contract may nonetheless seek indemnification from a seller if sued for infringement

---

[5]     *See, e.g.*, *ABB Inc.*, 2011 WL 553603, at *3 (holding that, where licensee contracted with a third party to manufacture patented material, patentee's threats that third party's activity was not covered by the license created an Article III case or controversy because the licensee "had an interest in determining whether it would incur liability for induced infringement, and it had an interest in determining whether it would be liable for indemnification, which turned on whether [the third party] would be liable for infringement"); *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 733, 736–37 (Fed. Cir. 1988), *overruled on other grounds by MedImmune*, 549 U.S. at 127; *see also Microchip Tech.*, 441 F.3d at 944 (patentee's threats against supplier's customers did not create an Article III case or controversy because, inter alia, there was "nothing in the record to indicate that [the supplier] ha[d] induced or contributed to infringement," and the supplier "ha[d] not produced any agreement indemnifying a customer against infringement").

based on its use of the seller's product).  We need not reach the indemnification issue, for we conclude that, applying the standard articulated by the Supreme Court in *MedImmune*, there is an actual controversy between Arris and BT concerning Arris' liability for, at least, contributory infringement.

## II

Here, BT has accused Cable One of infringing system and method claims of the patents-in-suit.  When the holder of a patent with system claims accuses a customer of direct infringement based on the customer's making, using, or selling of an allegedly infringing system in which a supplier's product functions as a material component, there may be an implicit assertion that the supplier has indirectly infringed the patent.[6]  Likewise, when the holder of a patent with method claims accuses the supplier's customers of direct infringement based on their use of the supplier's product in the performance of the claimed

---

[6]    *See, e.g., Nat'l Coupling Co. v. Press-Seal Gasket Corp.*, 323 F.2d 629, 630, 632–33 (7th Cir. 1963) (actual controversy existed regarding indirect infringement where defendant "charged contributory infringement" by sending plaintiff's customer a letter alleging that plaintiff's gasket product, when installed on concrete pipe, infringed defendant's claimed "Gasket and Pipe End Construction for Bell and Spigot Pipe" device); *Nippon Elec. Glass Co., Ltd. v. Sheldon*, 489 F. Supp. 119, 122 (S.D.N.Y. 1980) ("Once defendant accused Sony and Panasonic of direct infringement due to their use of plaintiff's product, plaintiff had reason to fear that it could be sued as a contributory infringer.  It, therefore, was entitled to seek declaratory relief, even though defendant ha[d] not yet directly charged plaintiff with contributory infringement.") (internal citation omitted).

method, an implicit assertion of indirect infringement by a supplier may arise.[7]

Pursuant to § 271(c) of the Patent Act, an act of contributory infringement may include either the sale of a "component of a patented machine, manufacture, combination or composition" (including a component used in a claimed system), or the sale of a "material or apparatus for use in practicing a patented process." 35 U.S.C. § 271(c). This covers both contributory infringement of system claims[8] and method claims.[9] To hold a component

---

[7] *See, e.g., Sticker Indus. Supply Corp. v. Blaw-Knox Co.*, 367 F.2d 744, 747 (7th Cir. 1966) (where declaratory plaintiff's product allegedly was not a staple item of commerce and patentee had informed plaintiff's customers that unlicensed use of plaintiff's product would infringe its method patent, Article III case or controversy existed because plaintiff "had good reason to fear that it might be liable for contributory infringement").

[8] Claims which recite a "system," "apparatus," "combination," or the like are all analytically similar in the sense that their claim limitations include elements rather than method steps. All such claims can be contributorily infringed by a component supplier. *See, e.g., Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1337, 1353–54 (Fed. Cir. 2010) (upholding ITC's decision that defendant contributorily infringed patent claim for a "semiconductor assembly" by importing and selling semiconductor chips that its customers incorporated into their infringing products); *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1359, 1361–65 (Fed. Cir. 2006) (upholding district court's finding that defendant contributorily infringed patent claim for a "fireplace assembly" by supplying a component of the assembly).

[9] *See, e.g., i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 850 (Fed. Cir. 2010) ("A party is liable for contributory infringement if that party sells, or offers to sell, a material or apparatus for use in practicing a patented process."), *cert. granted on other grounds*, 131 S. Ct. 647 (2010); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d

supplier liable for contributory infringement, a patent holder must show, inter alia, that (a) the supplier's product was used to commit acts of direct infringement; (b) the product's use constituted "a material part of the invention"; (c) the supplier knew its product was "especially made or especially adapted for use in an infringement" of the patent; and (d) the product is "not a staple article or commodity of commerce suitable for substantial noninfringing use." *Id.*; *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1316–17 (Fed. Cir. 2010).

There is no question here that BT accused Arris' customer Cable One of direct infringement of various system and method claims, including claims 1–15 of the '350 patent; claims 19–20 of the '989 patent; claim 23 of the '264 patent; and claims 1, 8–12, 15, 18, 20–21, 26–28, 30, 37–40, 42, 44, and 46–48 of the '532 patent. According to BT, the parties' discussions were limited solely to infringement by Cable One's network and the licensing of Cable One; BT contends "[t]here was no discussion of any potential infringement of the Patents-in-Suit, either directly or indirectly (i.e., inducing or contributing to infringement), by Arris." Appellee's Br. 7. The 118-page presentation of BT's infringement contentions, however, paints a different picture. While the presentation did not expressly accuse Arris of contributory infringement, BT

---

1301, 1320–21 (Fed. Cir. 2009) (upholding jury's finding of contributory infringement where defendant's software product was used for practicing claimed method of entering data without a keyboard); *AquaTex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1379 (Fed. Cir. 2005) ("Although not directly infringing, a party may still be liable for inducement or contributory infringement of a method claim if it sells infringing devices to customers who use them in a way that directly infringes the method claim.").

explicitly and repeatedly singled out Arris' products used in Cable One's network to support its infringement contentions. BT clearly identified Arris' CMTS and E-MTA products as embodying numerous elements and performing numerous method steps of the asserted claims. Before presenting any claim tables, BT laid the foundation for its allegations, stating:

> Subsequent to July 2005, Cable One used Arris Cadant C4 CMTS and Touchtone Telephony Modems TM402 (E-MTA) for its VoIP deployment. We assume that all VoIP customers are provided with data-over-cable services via Arris CMTS's. The VoIP solution is certified against PacketCable and DOCSIS standards.

J.A. 184. The 118-page presentation then proceeded to discuss Arris' CMTS and E-MTA products on at least 77 pages, including in multiple claim tables purporting to match components of Cable One's network to elements of the system claims and method steps of the method claims of the patents-in-suit.[10] On at least 26 pages, Arris was specifically referenced by name, Arris' products were identified by brand name and model number (e.g., Arris Cadent® C4 CMTS), or Arris' product literature was copied from its website for illustrative effect.[11] The presentation made it clear that Cable One's use of Arris' CMTSs and E-MTAs was central to BT's infringement contentions. For many of the asserted claims, BT contended that virtually all of the claimed system's elements

---

[10]   *See* J.A. 184, 190–91, 195, 201, 203–05, 208–09, 211–33, 235–43, 245–52, 256–61, 263–65, 268–69, 273–74, 276–86, 291, 294–95.

[11]   *See* J.A. 184, 190–91, 195, 201, 211–12, 214, 223, 235–41, 243, 245–48, 257, 263, 273, 276, 285.

or method steps were practiced by Arris' CMTSs or E-MTAs when used in Cable One's network.

For example, with respect to the '989 patent, BT's presentation purported to "present two claims tables: Independent Claim 19—Reading on the operation of E-MTAs" and "Dependent Claim 20—Reading on the operation of CMTSs." J.A. 208. Claim 19 claims "[a] packet network comprising *one or more packet network elements*, *each* packet network element *comprising*" a number of claimed limitations. '989 Patent col.21 ll.48–54 (emphases added). BT's analysis of claim 19 stated that the "*one or more packet network elements* is the E-MTA." J.A. 212 (providing a picture of Arris' E-MTA and a link to Arris' website) (emphasis in original). BT's claim table then purported to match every limitation of claim 19's "packet network element" to the functionality of Arris' E-MTA within Cable One's network. *See* J.A. 210–32. Similarly, claim 20 recites "[a] network as claimed in claim 19 further comprising *one or more host elements . . . , each* said host element *comprising*" a number of limitations. '989 Patent col.22 ll.15–30 (emphases added). BT's presentation asserted that "*[t]he CMTS is a Host Element* in accordance with claim 20," J.A. 233 (emphasis added), and its claim table matched every limitation of claim 20's "host element" to the functionality of the "Arris Cadant® C4 CMTS" used in Cable One's network, J.A. 236. *See* J.A. 234–51. This section of BT's presentation concluded: "[A]s shown in the first claim table, Cable One's configuration and use of the CM component within E-MTAs infringes claim 19. In addition, Cable One's configuration and use of CMTSs with E-MTAs infringes claim 20." J.A. 252.

BT's presentation gave similar treatment to many of the asserted claims of the other patents-in-suit. Claim 23 of the '264 patent recites "[a] method for controlling

acceptance of a call for a node in a communications network," '264 Patent col.18 ll.38–48, and BT's presentation argued that Arris' Cadant® C4 "CMTS equipment implemented according to DOCSIS 1.1 and PacketCable 1 or later version standards provides *a method of controlling acceptance of a call* as recited in the ['264] patent," J.A. 256–57. BT's claim table matched the functionality of Arris' CMTSs within Cable One's network to the performance of every method step of claim 23. J.A. 255–69. Similarly, claim 30 of the '532 patent recites "[a] method of controlling a bidirectional broadband and telephone network from an end of the network," '532 Patent col.13 ll.22–36, and BT's claim tables again linked the functionality of Arris' E-MTAs or CMTSs within Cable One's network to the performance of every method step, J.A. 272–88.

At a minimum, BT identified Arris' CMTSs or E-MTAs (or the CM or MTA sub-components of the E-MTA) as satisfying at least one essential element or method step for every asserted claim analyzed in its presentation. BT's extensive focus on Arris' CMTS and E-MTA products in its infringement contentions implies that Arris' products are being used as a "material part" of the allegedly infringed invention—one of the required elements of contributory infringement under 35 U.S.C. § 271(c). Moreover, BT alleges that Arris' CMTSs and E-MTAs were designed specifically for use under the DOCSIS and PacketCable standards for VoIP,[12] suggesting that they

---

[12] *See, e.g.*, J.A. 181 ("Cable One has implemented on its cable networks high-speed data service to its customers based on DOCSIS technology."); J.A. 184 (explaining that the "VoIP solution" provided by Arris' E-MTAs and CMTSs "is certified against PacketCable and DOCSIS standards"); J.A. 203 (citing, in a claim comparison chart, the fact that "[t]he E-MTA and CMTS operate in accordance with the DOCSIS 1.1 and PacketCable v1.0

are "especially made or especially adapted" for a use that infringes the patents-in-suit and are "not . . . staple article[s] or commodit[ies] of commerce suitable for substantial noninfringing use." 35 U.S.C. § 271(c).

In addition to the content of BT's infringement accusations against Cable One, we find it relevant that Arris was directly and substantially involved in BT's infringement and licensing negotiations. While direct communication between a patentee and a declaratory plaintiff is not necessary to confer standing, *see Arrowhead*, 846 F.2d at 736 ("[I]f the circumstances warrant," an actual controversy "may be found in the absence of *any* communication from the defendant to the plaintiff."), the nature and extent of any communications between the declaratory plaintiff and the patentee are certainly relevant factors to consider when evaluating whether there is an Article III case or controversy between the parties. Here, the communication to Arris of BT's infringement contentions was direct and repetitive. Arris was included in the latter two of the three meetings between BT and Cable One—both of which were held at Arris' office in Suwanee, Georgia. At the second meeting, BT presented the same 118-page presentation of infringement contentions that it had previously presented solely to Cable One at the first meeting in Phoenix. This activity shows that Arris was within BT's primary intended audience at the second meeting. At the third meeting, Arris presented its responses to BT's infringement contentions, and BT thereaf-

Specifications"); J.A. 256 ("CMTS equipment implemented according to DOCSIS 1.1 and PacketCable 1 or later version standards provides *a method of controlling acceptance of a call* as recited in the ['264] patent."); J.A. 258 ("The recited method of controlling acceptance of a call for a node in a communications network operated by Cable One involves the inter-operation of any CMTS equipment in conformance to the PacketCable DQoS Specification.").

ter requested that Arris send it "formal rebuttal information." J.A. 590. After Arris sent the materials, two conference calls took place between Arris and BT during which Arris presented its non-infringement arguments and BT responded. This protracted process between Arris and BT supports the conclusion that there was an Article III case or controversy regarding whether Arris was contributorily infringing the patents-in-suit.[13]

BT makes several arguments as to why there is no Article III case or controversy between it and Arris. None of them is convincing. First, BT argues the district court properly held that no case or controversy existed between it and Arris because BT did not explicitly accuse Arris itself of direct or indirect infringement. But such an express accusation is unnecessary. As we have repeatedly held, "a specific threat of infringement litigation by the patentee is not required to establish jurisdiction, and a 'declaratory judgment action cannot be defeated simply by the stratagem of a correspondence that avoids magic words such as "litigation" or "infringement."'" *ABB Inc.*,

---

[13] There is also a possible issue as to induced infringement. Section 271(b) covers active inducement of infringement, which typically includes acts that intentionally cause, urge, encourage, or aid another to directly infringe a patent. 35 U.S.C. § 271(b). "[I]nducement requires that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc) (internal quotations and citations omitted). The Supreme Court is currently considering the scope of the specific intent requirement for induced infringement in *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 458 (2010) (cert granted). Because we conclude there is a sufficient controversy regarding contributory infringement, we need not address whether there was an Article III case or controversy in this case regarding induced infringement.

2011 WL 553603, at *2 (quoting *Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1362 (Fed. Cir. 2009) (holding that actual controversy as to infringement existed where patent owner sent plaintiff two letters seeking "to discuss" the patent)).  Here, even in the absence of an express accusation against Arris, we think the circumstances indicate there is a dispute between Arris and BT concerning Arris' liability for contributory infringement that is sufficient to constitute an Article III case or controversy.

Second, BT argues that its allegations against Cable One should not be construed as including any implicit assertions of indirect infringement by Arris because BT included an express disclaimer of such in its infringement contentions.   BT's 118-page presentation repeatedly included the following statement:

> These assertions are based around the combination of supplier equipment deployed in a way that is unique to cable companies.  Nothing in this assertion is meant to accuse any *particular* supplier [of] equipment of patent infringement.

J.A. 178, 192, 206, 253, 270 (emphasis added).  We are not persuaded by BT's disclaimer.  Far from suggesting that BT did not have a claim against Arris, the disclaimer's use of the word "particular" appears to suggest that some supplier or suppliers are accused.  It is clear that the accused supplier is Arris.  BT's infringement contentions focused primarily on Arris' equipment, and BT expressly excluded the equipment of Arris' main competitor Cisco from its allegations.  Arris and Cisco are direct competi-

tors who sell similar CMTS and E-MTA products,[14] but BT drew a distinction between Arris and Cisco (and Cisco's subsidiary Scientific Atlanta) by notifying Cable One that "BT wishes to make it clear that this *assertion* [of infringement] does not relate to Cisco or Cisco *products*" because "Cisco has secured a license in all of these patents being asserted against Cable One." J.A. 179 (emphases added). BT further noted that the "*products*" of Cisco's subsidiary Scientific Atlanta "*are covered by* the Cisco license from BT." *Id.* (emphases added). By expressly noting that its "assertion" of infringement does not apply to Cisco's licensed "products" and that Scientific Atlanta's products "are covered by" the license, BT implied that the "assertion" of infringement was applicable to Arris' unlicensed products and that Arris was liable for infringement. BT's disclaimer that nothing in its assertion is meant to accuse any particular supplier of infringement is at best a transparent attempt to defeat Arris' standing to bring this declaratory judgment action. The actual controversy with Arris that BT has created by its accusations cannot be so easily avoided.

Third, BT surprisingly appears to contend that Arris' burden as the declaratory judgment plaintiff includes the burden of presenting evidence that Arris' actions indirectly infringe the patents-in-suit. Ironically, BT overlooks the fact that the very purpose for an accused

---

[14] *See* Declaration of Armando Rois-Méndez in Support of Opposition of Arris Group, Inc. to Motion to Dismiss, ¶ 16, at J.A. 565 ("Cisco Systems, Inc. and Scientific-Atlanta, Inc. are and have been Arris's competitors, and sell products which compete with Arris products including, in particular, the Arris products accused by BT."); BT Licensing Proposal (Dec. 15, 2008), at J.A. 328 (acknowledging that "9 CISCO CMTS's & 48 ARRIS CMTS's" were operating together in Cable One's network).

infringer to bring a declaratory judgment action is to seek a judicial determination that a coercive claim by the patent holder would *not* succeed on the merits. While a declaratory plaintiff indeed has the burden of "demonstrating [that] an actual case or controversy" exists, *King Pharm.*, 616 F.3d at 1282, that burden does not extend to showing that the defendant holds meritorious positions on the issues in controversy. As we have stated, "[i]t [would be] incongruous to require that one seeking a declaration of *noninfringement* prove its process or product is the 'same as' or 'identical' to the patented process or product." *Arrowhead*, 846 F.2d at 738. "To require declaratory judgment plaintiffs to allege or show that their products or processes *are* infringements . . . would limit the judgments they seek to declarations of invalidity or unenforceability." *Id.* at 738 n.10. The Declaratory Judgment Act is not so limited.

Finally, BT suggests that it has agreed not to sue Arris for infringement. In a line of cases beginning with *Super Sack Manufacturing Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1059–60 (Fed. Cir. 1995), we have held that a patentee's grant of a covenant not to sue a supplier for infringement can eliminate the supplier's standing to bring a declaratory judgment action.[15] At oral

---

[15] *See, e.g., Dow Jones & Co., Inc. v. Ablaise Ltd.*, 606 F.3d 1338, 1348 (Fed. Cir. 2010); *Benitec Aust., Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1346–48 (Fed. Cir. 2007); *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1369 (Fed. Cir. 2004); *Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 855–56 (Fed. Cir. 1999); *Spectronics Corp. v. H.B. Fuller Co., Inc.*, 940 F.2d 631, 637–38 (Fed. Cir. 1991). More recently, we have held that "whether a covenant not to sue will divest the trial court of jurisdiction depends on what is covered by the covenant." *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 556 F.3d 1294, 1297 (Fed. Cir. 2009); *see also Fort*

argument in our court, BT represented that it "do[es] not assert that [Arris' products] directly infringe . . . [or] that [Arris] contributorily infringe[s]" the patents-in-suit by selling its products to Cable One. Oral Arg. at 14:25–14:45, *available at* http://www.cafc.uscourts.gov/oral-argument-recordings/2010-1292/all. However, BT has not provided any covenant that would protect Arris from liability for indirect infringement. When questioned as to why, given its professed position on Arris' infringement liability, BT did not simply grant Arris a covenant not to sue, BT replied: "Why should BT give them a covenant not to sue, when for all BT knows maybe they are out there inducing infringement unbeknownst to BT? . . . BT doesn't need to forfeit a potential future right . . . to dispel [a suit for declaratory judgment]." *Id.* at 19:25–19:55. These statements fall far short of a covenant not to sue. Indeed, we have recognized that "a patentee's refusal to give assurances that it will not enforce its patent is relevant to the determination [of declaratory judgment standing]." *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1341 (Fed. Cir. 2008) (quoting *BP Chems. v. Union Carbide Corp.*, 4 F.3d 975, 980 (Fed. Cir. 1993)). Under these circumstances, BT's refusal to grant Arris a covenant not to sue provides a level of additional support for our finding that an actual controversy exists between Arris and BT regarding contributory infringement.

Accordingly, we find that BT's infringement accusations against Cable One carried the implied assertion that

---

*James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1348–49 (Fed. Cir. 2005) (finding declaratory judgment standing for counterclaim of invalidity where patentee offered covenant not to sue only after a jury finding of non-infringement); *Teva Pharm.*, 620 F.3d at 1346–48 (finding declaratory judgment standing in the Hatch-Waxman context in spite of a covenant not to sue); *Caraco Pharm.*, 527 F.3d at 1291–94 (same).

Arris was committing contributory infringement, and BT repeatedly communicated this implicit accusation directly to Arris during the course of a protracted negotiation process. Arris certainly "had good reason to fear that it might be liable for contributory infringement." *Sticker Indus.*, 367 F.2d at 747; *see also ABB Inc.*, 2011 WL 553603, at \*3. From our consideration of "all the circumstances," *MedImmune*, 549 U.S. at 127, there is an Article III case or controversy between Arris and BT regarding Arris' potential liability for contributory infringement.

We reverse the district court's dismissal of this case for lack of subject matter jurisdiction and remand for further proceedings consistent with this opinion.

**REVERSED and REMANDED**