NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**UCP INTERNATIONAL COMPANY LIMITED, GLOBAL UNITED ENTERPRISES LIMITED,**
*Plaintiffs-Appellees*

**v.**

**BALSAM BRANDS INC., BALSAM INTERNATIONAL UNLIMITED COMPANY,**
*Defendants-Appellants*

---

2018-1256

---

Appeal from the United States District Court for the Northern District of California in No. 3:16-cv-07255-WHO, Judge William H. Orrick, III.

---

SEALED OPINION ISSUED: September 19, 2019
PUBLIC OPINION ISSUED: October 7, 2019*

---

PATRICIA LYNN PEDEN, Burke, Williams & Sorensen, LLP, Oakland, CA, argued for plaintiffs-appellees. Also represented by BRYAN CHRISTOPHER SMITH, LeClairRyan,

---

\* This opinion was originally filed under seal and has been unsealed in full.

A Professional Corporation, Rochester, NY.

DEANNE MAYNARD, Morrison & Foerster LLP, Washington, DC, argued for defendants-appellants. Also represented by SETH W. LLOYD; ROSE S. LEE, Los Angeles, CA; MICHAEL ALLEN JACOBS, San Francisco, CA; MARC N. BERNSTEIN, The Business Litigation Group, P.C., San Francisco, CA.

—————————

Before WALLACH, CLEVENGER, and TARANTO, *Circuit Judges.*

CLEVENGER, *Circuit Judge.*

Appellees UCP International Company and Global United Enterprises (collectively, "UCP") sued Appellants Balsam Brands Inc. and Balsam International Unlimited (together, "Balsam") in the U.S. District Court for the Northern District of California seeking a declaratory judgment of non-infringement of all claims of Balsam's U.S. Patent Nos. 8,062,718 ("the '718 patent") and 8,993,077 ("the '077 patent") (collectively, "the Patents-in-Suit"). The District Court granted UCP's motion for summary judgment, holding that UCP's product does not infringe, either literally or under the doctrine of equivalents, the Patents-in-Suit. The district court thereafter entered final judgment in favor of UCP and against Balsam. Balsam appeals from that judgment. For the reasons set forth below, we *vacate* the district court's judgment and *remand* for proceedings consistent with this opinion.

BACKGROUND

I

A

Balsam manufactures and sells invertible artificial Christmas trees. It owns the rights to the Patents-in-Suit, which were both issued to Bruce Schooley. The two patents

share the same specification and they bear the same title, "Invertible Christmas Tree."[1]

The trees claimed by the Patents-in-Suit allow for easier set-up and storage from year to year because, unlike previous artificial Christmas trees, the limbs of the patented trees remain attached during storage, and when the tree is turned from the upside-down to the right-side-up position, the limbs automatically deploy. The trees are also easy to deploy and collapse because they have two trunk portions, a first portion that remains fixed to the movable stand, and a second portion that is connected to, and rotates about, the fixed portion. The two trunk portions are connected by what the patents refer to as a "pivot joint," which allows an individual to reconfigure the tree from a collapsed to a deployed position "with a minimum of strength or dexterity." '718 patent, col. 2 ll. 7–8, 21.

The specification describes the second trunk portion as being "pivotably attached to the first trunk portion, at least indirectly, through at least one pivot joint." *Id.*, col. 2 ll. 20–21. The "pivot joint" is "typically adjacent" to the upper end of the first trunk portion. *Id.*, col. 2 ll. 21–24. Further, the second trunk portion is "pivotably attached . . . to the first trunk portion" at a part of the second trunk portion "between a first end and a second end of the second trunk portion." *Id.*, col. 2 ll. 25–28. The pivot joint "allows at least one second trunk portion to pivot substantially 180° from a collapsed orientation . . . to a deployed orientation." *Id.*, col. 2 ll. 28–32.

Figures 18 through 21 of the Patents-in-Suit show different types of "pivot[s]." '718 patent, col. 7 l. 51. The specification explains that the "pivot 36 can be as simple as a

<hr />

[1]     Because the Patents-in-Suit share a common specification, we cite to only the '718 patent for ease of reference unless otherwise specified.

hole passing laterally through the fixed trunk 30 with an axle 37 passing laterally through this hole." *Id.*, col. 7 ll. 31–33. However, while the axle and hole pivot joint, shown below, "is perhaps the simplest embodiment for the pivot 36," the specification explicitly allows for "other embodiments . . . including those depicted in FIGS. 18-21." *Id.*, col. 7 ll. 49–52.



*Fig. 9*

*Id.*, Fig. 9.

Figures 18 and 19, reproduced below, "depict front and top views of an alternate joint 136 with a bracket 138 pivotably attached" to the fixed trunk portion and either pivotably attached or fixed to the rotating trunk portion. *Id.*, col. 7 ll. 52–56. The rotation of the second, rotating trunk in Fig. 18 occurs "by first moving along arrow C', then moving along arrow C''" to achieve 180° of rotation. *Id.*, col. 7 ll. 57–59.



Fig. 18

Fig. 19

*Id.*, Figs. 19 and 20.

Independent claim 1 of the '718 patent is representative and recites:

A collapsible Christmas tree, comprising in combination:

a first trunk portion;

said first trunk portion having an elongate form extending between an upper end and a lower end, said upper end above said lower end when said first trunk portion is supported upon a floor;

a second trunk portion having an elongate form between a first end and a second end;

said second trunk portion including a plurality of limbs extending laterally therefrom;

*a pivot joint coupling said first trunk portion to said second trunk portion in a*

*manner allowing pivoting of said second trunk portion relative to said first trunk portion*;

said pivot joint interfacing with said first trunk portion at a location closer to said upper end than to said lower end; and

said pivot joint interfacing with said second trunk portion at a location spaced from both said first end and said second end of said second trunk portion.

*Id.* col. 17 ll. 9–29 (emphasis added).

## B

UCP also manufactures invertible artificial Christmas trees ("the Accused Product"). UCP is a Chinese manufacturer based in Hong Kong. UCP formally sold its invertible trees to Frontage Marketing, Inc. and Cinmar, LLC (collectively, "Frontgate"), until Balsam sued Frontgate in the district court, *Balsam Brands Inc. v. Cinmar, LLC*, No. 3:15-cv-04829-WHO (N.D. Cal.) ("the Frontgate Litigation"), and obtained a settlement resulting in a stipulated dismissal of the suit. The relationship between UCP and Frontgate did not continue after the suit was dismissed.

It is undisputed that the Accused Product also includes a stationary trunk and a movable trunk that are connected by a combination of a bracket, pins, and a slotted plate. UCP obtained a patent covering its Accused Product, which includes a figure, shown below, disclosing the slotted plate inversion mechanism.



U.S. Patent No. 9,581,287, Fig. 1b.

II

In the Frontgate Litigation, Balsam sued Frontgate for its alleged infringement of the same patents at issue in the current appeal. The Frontgate Litigation also took place in the same court and in front of the same judge as the action below. Balsam argued that Frontgate infringed the Patents-in-Suit by selling the artificial Christmas tree manufactured by UCP. Frontgate is Balsam's closest competitor in the market for high-end artificial Christmas trees. While Balsam was aware that UCP manufactured Frontgate's allegedly infringing trees, and that UCP agreed to defend and indemnify Frontgate, Balsam chose not to sue UCP.

After a claim construction hearing, the district court issued a claim construction order ("the Frontgate Order") construing a number of limitations relating to the connection between the first and second trunks of the trees claimed by the Patents-in-Suit. *See Balsam Brands Inc. v. Cinmar, LLC* (*Frontgate*), No. 15-CV-04829-WHO, 2016 WL 8346172 (N.D. Cal. Sept. 1, 2016). The district court, adopting a slightly modified version of Frontgate's proposed construction, construed "pivot joint" as "[a] joint allowing pivoting of the second trunk relative to the first trunk by a mechanical connection between the first trunk and the second trunk from which the second trunk turns

on a fixed point, changing the angle between the first and second trunk along their lengths." *Id.* at *3. The district court, again adopting a slightly modified version of Frontgate's construction, construed "pivoting" as "[t]urning on a fixed point." *Id.* at *10. Consistent with Balsam's construction, the district court construed "pivotably attached" and "pivotably joined" as "[a]ttached and permitting pivoting." *Id.* at *11. The district court also adopted Frontgate's construction of "pivot joint element," which construed the term as "[a] pivot joint that is placed on a separate spacing element to distance the pivot joint away from the end of the second trunk." *Id.* at *12. Rotating and rotation were construed as "turning around a fixed point" because the district court determined that the Patents-in-Suit used the terms "pivot" and "rotate" interchangeably. *Id.* at *13.

Shortly after the Frontgate Order issued, Balsam and Frontgate reached a settlement whereby Frontgate agreed to stop purchasing artificial Christmas trees from UCP ("the Agreement"). UCP was not part of the Agreement, and, in fact, the Agreement explicitly stated that it did not release UCP from liability for infringement. J.A. 441 ("[T]he above release does not apply to or release UCP (as defined above to include its Affiliates), or its officers, directors, shareholders, or agents."). The parties filed a joint stipulation to dismiss the case as a result of the Agreement.

On December 20, 2016, the same day that the district court dismissed Balsam's suit against Frontgate pursuant to the joint stipulation, UCP filed the declaratory judgment action that is the subject of the current appeal, *UCP Int'l Co. Ltd. v. Balsam Brands Inc.*, No. 16-CV-07255-WHO (N.D. Cal.). UCP sought a declaration of non-infringement with respect to all claims of the Patents-in-Suit. Balsam filed a motion to dismiss, claiming that there was no declaratory judgment jurisdiction because UCP's complaint did not allege that it was fearful of any legal action by Balsam, nor did it allege that Balsam threatened to sue UCP. In response, UCP amended its complaint, and Balsam filed

another motion to dismiss the amended complaint for the same reasons articulated in its first motion to dismiss.

The district court denied Balsam's motion because, despite the fact that Balsam contended that it had no interest in suing UCP, "Balsam's representations and conduct concerning whether it wants to sue UCP are not the measure of Article III standing in a declaratory judgment case." *UCP Int'l Co. Ltd. v. Balsam Brands Inc.* (*Balsam I*), 252 F. Supp. 3d 828, 833 (N.D. Cal. 2017). Because the district court found that "Balsam's litigation against Frontgate was an affirmative act by Balsam to enforce its patent rights against alleged infringement by UCP's Inversion Tree," and because UCP "demonstrated that it has already engaged in, and plans to continue engaging in, activities that Balsam has alleged infringe its Flip Tree patents," the district court found that UCP had declaratory judgment jurisdiction. *Id.* at 833–35.

Prior to summary judgment, the district court also decided that it would use the same claim constructions entered in its claim construction order in the Frontgate Litigation. Neither party objected to the district court's decision. Instead, the parties disagreed over how the documents from the Frontgate Litigation would be imported into UCP's declaratory judgment action. The parties reached an agreement to import specific documents from the Frontgate Litigation, and submitted to the court a joint stipulation to that effect.

Shortly thereafter, the parties submitted their summary judgment motions, and the district court granted UCP's motion for summary judgment of non-infringement. As an initial matter, the district court rejected Balsam's argument that "collateral estoppel should not apply to the Frontgate claim construction order." *UCP Int'l Co. Ltd. v. Balsam Brands Inc.* (*Balsam II*), No. 16-CV-07255-WHO, 2017 WL 5068568, at *3 (N.D. Cal. Nov. 3, 2017). It found instead that, under Ninth Circuit law, collateral estoppel

would apply to the Frontgate Order, and Balsam was therefore precluded from challenging the claim constructions in that Order.

As part of its literal infringement analysis, the district court addressed Balsam's expert's opinion that UCP's slotted plate design literally infringed the claimed pivot joint because (1) "the movable trunk portion turns on a fixed center on the slotted plate, and (2) the movable trunk portion turns on either pin in the slotted plate, and each pin is fixed relative to the movable trunk portion." *Id.* at 4. The district court did not credit that opinion because it "ignore[d] the express language from the Frontgate order construing 'pivot joint' as 'a mechanical connection . . . from which the second trunk turns on a fixed point.'" *Id.* (quoting *Frontgate*, 2016 WL 8346172 at *3). More specifically, the district court found that Balsam's expert's opinion "ignore[d] that the second trunk must be connected to the fixed point," and that "[i]f there is no connection between the fixed point and the second trunk, it is impossible for the trunk to 'turn[] on a fixed point.'" *Id.* Because, according to the district court, there was no connection between the fixed center of the slotted plate and the second trunk in the Accused Product, Balsam's expert's opinion on literal infringement could not prevent granting summary judgment in UCP's favor.

The district court also rejected Balsam's argument that the Accused Product infringed the Patents-in-Suit under the doctrine of equivalents. Therefore, the district court granted UCP's summary judgment motion of non-infringement.

Balsam now appeals from the district court's decision granting UCP's summary judgment motion. We have jurisdiction to decide this appeal under 28 U.S.C. § 1295(a)(1).

DISCUSSION

We review a district court's grant of summary judgment under the law of the regional circuit, which, in this case, is the Ninth Circuit. *MAG Aerospace Indus., Inc. v. B/E Aerospace, Inc.*, 816 F.3d 1374, 1376 (Fed. Cir. 2016). "The Ninth Circuit reviews the grant of summary judgment de novo." *Id.*

Four main issues are presented for our review. First, Balsam argues that the district court lacked jurisdiction over the suit because no controversy existed between the parties when UCP filed its declaratory judgment action. Second, Balsam contends that the district court erred in applying collateral estoppel to the Frontgate Order. Third, Balsam claims that, even if the Frontgate Order was binding, the district court either misapplied or improperly modified the constructions in that Order in its summary judgment opinion. Forth, Balsam argues that the district court erred in granting UCP's motion for summary judgment of non-infringement under the doctrine of equivalents. We address each of those issues in turn below.

I

We first address the threshold question of whether the district court had jurisdiction under the Declaratory Judgment Act because, if it did not, there would be no need to consider the merits of Balsam's appeal. *See Microchip Tech. Inc. v. Chamberlain Grp., Inc.*, 441 F.3d 936, 938 (Fed. Cir. 2006) (vacating the district court's grant of summary judgment and remanding with instructions to dismiss the case where the district court lacked jurisdiction under the Declaratory Judgment Act to reach the merits of the action). Federal Circuit law governs that inquiry when, as here, the underlying merits of an action involve patent infringement and/or validity. *Minnesota Min. & Mfg. Co. v. Norton Co.*, 929 F.2d 670, 672 (Fed. Cir. 1991). We review de novo a district court's jurisdictional determination

under the Declaratory Judgment Act. *Vanguard Research, Inc. v. PEAT, Inc.*, 304 F.3d 1249, 1254 (Fed. Cir. 2002).

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The purpose of the Declaratory Judgment Act, as the Supreme Court has explained, is to ameliorate the dilemma posed by "putting the challenger to the choice between abandoning his rights or risking prosecution." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007). While there is no bright-line rule for whether a dispute presents a case of actual controversy, the Supreme Court's decisions require:

> [T]hat the dispute be "definite and concrete, touching the legal relations of the parties having adverse legal interests"; and that it be "real and substantial" and "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."

*Id.* at 127 (quoting *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240–41 (1937)). The Declaratory Judgment Act thus allows a potential patent infringer to bring suit before the patentee does when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

Applying the Supreme Court's holding in *MedImmune*, we have held that "declaratory judgment jurisdiction generally will not arise merely on the basis that a party learns

of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement, without some affirmative act by the patentee." S*anDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1380–81 (Fed. Cir. 2007). Generally, an affirmative act by the patentee is "conduct that can be reasonably inferred as demonstrating intent to enforce a patent." *Hewlett–Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1363 (Fed. Cir. 2009); *see Asia Vital Components Co. v. Asetek Danmark A/S*, 837 F.3d 1249, 1253 (Fed. Cir. 2016) (same).

Balsam contends that the district court lacked jurisdiction over UCP's declaratory judgment action because Balsam took no affirmative acts indicating that it intended to enforce its patent rights against UCP. Balsam argues that it never sued UCP, it never threatened to sue UCP, and it had no intention of suing UCP. It argues additionally that it never sent a notice letter, demanded royalties, or even spoke to UCP prior to UCP's declaratory judgment action. Further, Balsam contends that, based on our precedent, the Frontgate Litigation cannot evidence an intent by Balsam to enforce its patent rights against UCP. According to Balsam, the district court, therefore, erred in finding that the Frontgate Litigation was enough to show an affirmative act taken towards UCP.

UCP counters that, on numerous occasions during the Frontgate Litigation, Balsam acted affirmatively in a way that demonstrated Balsam's intentions to enforce its patent rights, and in a way that implicated UCP as potentially liable for infringement. UCP points to the fact that, in the Frontgate Litigation, Balsam's complaint identified UCP's trees as the accused product, it submitted interrogatory responses accusing UCP of making infringing trees, and it submitted claim charts comparing its patented trees to UCP's trees. UCP also claims that Balsam represented to both UCP's counsel and the district court that it might sue UCP. Moreover, UCP contends that Balsam expressly

left UCP out of its settlement agreement with Frontgate, indicating that Balsam reserved the right to sue UCP.

We agree with UCP. We have previously affirmed a district court's determination that it had declaratory judgment jurisdiction where a patent holder sued a declaratory judgment plaintiff's customers in a prior suit, and submitted claim charts in that suit implying that the declaratory judgment plaintiff could be liable for indirect infringement. *See Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 905 (Fed. Cir. 2014). In *Microsoft*, the claim charts cited to the declaratory judgment plaintiff's software to support the patent holder's allegations of infringement by the declaratory judgment plaintiff's customers. *Id.* The claim charts also cited to the declaratory judgment plaintiff's user guides and documentation for every claim limitation. *Id.* Because providing instructions to use a product in an infringing manner is evidence of the required mental state for induced infringement, we held that there existed a substantial controversy regarding whether the declaratory judgment plaintiff induced infringement based on the patent holder's allegations of direct infringement. *Id.*

The facts of this case are even stronger than those in *Microsoft* because the claims at issue in this case are product claims, not method claims. Balsam's entire suit against Frontgate was based on its sales of UCP's trees. There was therefore no need to infer UCP's liability based on Frontgate's liability. In fact, Balsam admitted in its motion to dismiss for lack of subject matter jurisdiction that accusing Frontgate's trees of infringement necessarily meant it was accusing UCP's trees of infringement. J.A. 306 ("[B]y accusing Frontgate trees Balsam was necessarily accusing UCP trees."). Balsam's claim charts in the Frontgate Litigation demonstrated in detail how it believed UCP's trees infringed its patents, *see* J.A. 493 (recognizing UCP as the manufacturer of all of the accused trees cited in the claim charts), and its interrogatory responses stated that Frontgate "purchased and imported

the[] infringing trees from UCP." J.A. 626. During the Frontgate Litigation, Balsam also informed the district court that it might find it necessary to add UCP as a defendant in the infringement suit, *see* J.A. 766 (Case Mgmt. Tr.) ("THE COURT: . . . You told me in the last case that maybe you were going to bring UCP into it."), and when Balsam and Frontgate decided to settle the suit, the settlement agreement explicitly excepted UCP from any waiver of liability for infringement.

Balsam's counterarguments are unpersuasive. Balsam's assertion that declaratory judgment jurisdiction cannot lie here because Balsam never sued, threatened to sue, or intended to sue UCP runs clearly counter to our precedent. *See Arris Grp., Inc. v. British Telecommunications PLC*, 639 F.3d 1368, 1379 (Fed. Cir. 2011) (holding that "an express accusation [of infringement] is unnecessary"); *Danisco U.S. Inc. v. Novozymes A/S*, 744 F.3d 1325, 1330 (Fed. Cir. 2014) ("Article III does not mandate that the declaratory judgment defendant have threatened litigation or otherwise taken action to enforce its rights before a justiciable controversy can arise."); *SanDisk*, 480 F.3d at 1382–83 ("We decline to hold that Jorgenson's statement that ST would not sue SanDisk eliminates the justiciable controversy created by ST's actions, because ST has engaged in a course of conduct that shows a preparedness and willingness to enforce its patent rights despite Jorgenson's statement.").

Balsam's reliance on our decision in *Allied Mineral Prod., Inc. v. Osmi, Inc.*, 870 F.3d 1337 (Fed. Cir. 2017) is also misplaced. Balsam relies on *Allied* to support its argument that, without some form of communication between Balsam and UCP indicating that Balsam intended to enforce its patent rights against UCP, UCP cannot use the Frontgate Litigation to establish declaratory judgment jurisdiction. In *Allied*, however, we found that the totality of the circumstances did not support declaratory judgment jurisdiction because the patentee had never directed any

actions toward the declaratory judgment plaintiff, *and* it had never litigated or threated litigation in the U.S. on its U.S. patent that was the subject of the declaratory judgment action. 870 F.3d at 1339. The patentee brought suit in Mexico, on its Mexican patent, against Mexican entities, based on alleged infringement that occurred in Mexico. *Id.* The declaratory judgment plaintiff, the American manufacturer of the allegedly infringing Mexican products, claimed a controversy sufficient to confer declaratory judgment jurisdiction based on an assumption that that the patentee would, at some point, probably decide to enforce its U.S. patent in the U.S. court system against the manufacturer, an entity not related to the Mexican companies. *Id.* at 1341. Given the particular facts presented, we found too hypothetical that assumption, and thus there was no controversy of sufficient immediacy and reality to establish declaratory judgment jurisdiction. *Id.*

Here, Balsam brought suit against Frontgate in a U.S. district court on the same patents at issue in the declaratory judgment action. During that suit, Balsam also explicitly stated that it might find it necessary to sue UCP. As we explained in *Arris*, jurisdiction does not turn on whether the patentee specifically communicated with the declaratory judgment plaintiff. *See* 639 F.3d at 1378 ("[D]irect communication between a patentee and a declaratory plaintiff is not necessary to confer standing."). Instead, the relevant inquiry is whether the patentee's actions "can be reasonably inferred as demonstrating intent to enforce a patent." *Hewlett–Packard*, 587 F.3d at 1363. Balsam's conduct demonstrates that intent.

In the wake of *MedImmune*, we have also reiterated that "the issue of whether there has been meaningful preparation to conduct potentially infringing activity remains an important element" to consider in a declaratory judgment jurisdiction analysis. *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 880 (Fed. Cir. 2008). "If a declaratory judgment plaintiff has not taken significant, concrete steps

to conduct infringing activity, the dispute is neither 'immediate' nor 'real'" and thus an actual controversy between the parties cannot exist for purposes of establishing declaratory judgment jurisdiction. *Id.*

Balsam claims that UCP failed to demonstrate that it was engaging in potentially infringing acts in the United States when it filed suit against Balsam. According to Balsam, UCP manufactures its trees in China, and when UCP filed suit, it no longer had any U.S. sales or customers because its exclusive U.S. customer, Frontgate, stopped purchasing UCP's trees as part of the Agreement with Balsam. Balsam further argues that, to the extent that UCP's amended complaint alleged preparations to begin selling its artificial Christmas trees in the U.S. without Frontgate, those allegations were both vague and incapable of supporting jurisdiction at the time the action was filed. Balsam claims that those allegations could not have been true at the time of filing because UCP filed its declaratory judgement action only a few hours after losing its sole U.S. customer.

UCP argues in response that it was already engaging in potentially infringing acts when it filed its declaratory judgment complaint. UCP contends that the Frontgate Litigation clearly demonstrated that UCP had already finalized the design of its trees and sold those trees in the U.S. market. UCP claims that it also demonstrated its intention to continue selling its trees to other U.S. customers besides Frontgate. Thus, regardless of whether it was currently making sales of its trees, UCP argues that it clearly showed meaningful preparation to conduct potentially infringing activity, which is all that is required.

Again, we agree with UCP. There is no requirement that a declaratory judgment plaintiff actually sell its potentially infringing products for jurisdiction to lie. *See id.* at 881 ("[A] party need not have engaged in the actual manufacture or sale of a potentially infringing product to obtain

a declaratory judgment of non-infringement."). Thus, we find unpersuasive Balsam's argument that UCP cannot establish declaratory judgment jurisdiction because it is no longer conducting infringing activity after the Agreement with Frontgate.

We also find unpersuasive Balsam's contention that UCP failed to demonstrate that it was preparing to conduct infringing activity after losing Frontgate as a customer. In its amended declaratory judgment complaint, UCP stated that it "intends to sell its inversion tree in the U.S., and is in discussions with a potential customer who seeks to purchase UCP's inversion tree." J.A. 222. It stated additionally that it was "taking steps in preparation for making direct sales into the U.S," and that it "has an inventory of inversion trees it is actively seeking to sell." *Id.*; J.A. 227. A declaration submitted by UCP's Vice President of Production Management supported those allegations. Contrary to Balsam's arguments, those allegations properly support UCP's declaratory judgment jurisdiction.

This court has stated previously that "the proper focus in determining jurisdiction are 'the facts existing at the time the complaint under consideration was filed.'" *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1337 (Fed. Cir. 2008) (quoting *GAF Bldg. Materials Corp. v. Elk Corp.*, 90 F.3d 479, 483 (Fed. Cir. 1996)). The Supreme Court has also said that "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473–74 (2007). It is true that "[l]ater events may not create jurisdiction where none existed at the time of filing," *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 635 (Fed. Cir. 1991), *abrogated on other grounds by Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361 (Fed. Cir. 2004), but, as long as the facts alleged in an amended complaint did not arise after filing, we may properly consider them in determining jurisdiction.

There is no dispute that UCP was successfully selling a relatively large volume of potentially infringing trees in the U.S. prior to filing its declaratory judgment action. There is, therefore, a strong inference that UCP had an inventory of potentially infringing trees, as it alleges, and that it had planned to sell that inventory, either directly or through a distributor, into the U.S. at the time it filed its declaratory judgment action. Regardless of the fact that it lost Frontgate's business shortly before filing its declaratory judgment action, there is no reason to believe that UCP was not soliciting other customers or looking for ways to sell its product directly in the U.S. There is no requirement that UCP allege more than it did to establish a controversy for purposes of declaratory judgment jurisdiction. *See Arkema Inc. v. Honeywell Int'l, Inc.*, 706 F.3d 1351, 1358 (Fed. Cir. 2013 ) (holding that, where it was clear that Arkema wished to sell its product, and manufacturers wished to purchase that product, there was "no requirement that Arkema identify the particular manufacturers that will purchase [Arkema's product]" for purposes of establishing declaratory judgment jurisdiction).

Considering the totality of the circumstances, we agree with the district court that there is a substantial controversy of sufficient immediacy and reality to confer declaratory judgment jurisdiction.

## II

Turning to the merits of Balsam's appeal, Balsam first contends that summary judgment of non-infringement must be reversed because it is based on an incorrect claim construction imported from the Frontgate Litigation. According to Balsam, the district court in the Frontgate Litigation erred in construing "pivot joint" and "pivoting" to require that the second trunk of the invertible Christmas tree "turn on a fixed point." *Frontgate*, 2016 WL 8346172 at *3, *10. The district court below applied the constructions from the Frontgate Order because it held that the

doctrine of collateral estoppel applied to that Order. Balsam argues that, contrary to the district court's conclusion, the doctrine of collateral estoppel does not apply to the Frontgate Order, and thus it should not be precluded from challenging those constructions in its suit with UCP.

We find it unnecessary to address the parties' arguments regarding collateral estoppel because, for the reasons discussed below, we find no error in the Frontgate court's constructions of the "pivot joint" and "pivoting" terms. Thus, even if we disagreed with the district court that collateral estoppel applied to the Frontgate Order, it would not be a reason to reverse the district court's judgment.

"[C]laim construction must begin with the words of the claims themselves." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 457 F.3d 1293, 1301 (Fed. Cir. 2006). "The words used in the claims are interpreted in light of the intrinsic evidence of record, including the written description, the drawings, and the prosecution history . . . ." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002). To the extent the district court relied on intrinsic evidence in construing the claim terms, we review the district court's analysis de novo. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

In addition to intrinsic evidence, district courts can also look to extrinsic evidence in the form of expert testimony to, among other things "provide background on the technology at issue" or "establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005). Extrinsic evidence is, however, generally viewed as less reliable than intrinsic evidence in determining the proper construction of a claim term. *Id.* To the extent the district court relied on extrinsic evidence to construe the claims, we must review those factual determinations for clear error. *Teva Pharm.,* 135 S. Ct. at 838, 841.

In the Frontgate Order, the district court construed the claim terms "pivot joint" and "pivoting," among others.  For both terms, it adopted slightly modified versions of Frontgate's constructions.  It construed "pivot joint" as "[a] joint allowing pivoting of the second trunk relative to the first trunk by a mechanical connection between the first and the second trunk from which the second trunk turns on a fixed point, changing the angle between the first trunk and the second trunk along their lengths." *Frontgate*, 2016 WL 8346172 at \*3.  It construed "pivoting" as "turning on a fixed point." *Id.* at \*10.  Both below and on appeal, Balsam takes issue with the "on a fixed point" aspect of those constructions.  Balsam contends that the "on a fixed point" limitation is not supported by the intrinsic evidence.  Instead, Balsam argues that the intrinsic evidence describes "pivoting" more broadly as the relative motion a pivot joint permits between the first and second trunk.  We disagree.

Neither Balsam nor its expert, Dr. McCarthy, dispute that, to a person having ordinary skill in the art ("PHOSITA"), the ordinary and customary meaning of pivoting requires movement around a roughly fixed point. *See Id.* at \*6 ("Balsam does not dispute that Frontgate's position on the ordinary and customary meaning of 'pivot' is generally accurate."); J.A. 3784 (McCarthy Deposition) ("Q[:] Have you heard the fulcrum in a lever system also called a pivot? A[:] Yes. . . . Q[:] So in a simple lever system, the load travels in a circle around the fulcrum? A[:] In this canonical representation, that would be roughly correct."); *id.* ("A[:] . . . pivoting around a point will describe a circular path . . . ."); J.A. 3788 (McCarthy Deposition) ("A[:] . . . [a PHOSITA] might understand 'pivoting' as in a canonical sense of . . . it rotates -- something rotates around a shaft.").  It argues instead that the Patents-in-Suit use the term in a broader sense.  None of Balsam's citations to the intrinsic evidence, however, undermine the presumption that "pivot" and "pivoting" are used in the customary sense, and there is no evidence that the patentee acted as his own

lexicographer when he used the terms "pivot" and "pivoting." *See Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1148 (Fed. Cir. 2003) (explaining that there is generally a "heavy presumption in favor of the ordinary meaning of claim language as understood by one of ordinary skill in the art," which can be overcome by the patentee's lexicography only when the patentee "clearly set[s] forth an explicit definition for a claim term"). In fact, in every preferred embodiment in the specification "the first and second trunk portions are attached in a way that allows for motion on a fixed point," as the district court correctly found. *Frontgate*, 2016 WL 8346172 at *10.

Balsam cites to its expert's testimony to support its argument that the preferred embodiment shown in Figure 18 of the Patents-in-Suit discloses a pivot joint that allows for both translational and rotational movement. According to Dr. McCarthy, that means that the pivot joint in Figure 18 has multiple axes of rotation, demonstrating that the second trunk is not limited to movement about any particular fixed point. *See* J.A. 3023–25 ("[W]hen the body is translating (moving in space) at the same time it is rotating (changing in orientation), . . . there is no stationary, i.e. fixed, single axis of rotation . . . ."). Thus, Balsam contends that requiring fixed-point rotational movement would read the preferred embodiment shown in Figure 18 out of the claims, a fact that puts the construction squarely at odds with a fundamental canon of claim construction.

Balsam's argument is unpersuasive. The Patents-in-Suit allow for an indirect connection between the first and second trunks. *See* '718 patent, col. 2 ll. 19–21 ("[A]t least one second trunk portion pivotably attached to the first trunk portion, *at least indirectly*, through at least one pivot joint." (emphasis added)). The preferred embodiment shown in Figure 18 discloses such an indirect connection. That indirect connection between the first and second trunks does not, however, undermine the district court's construction, regardless of whether it permits both

rotational and translational movement.  The bracket that indirectly couples the first and second trunks in Figure 18 is still attached to a fixed point at the top of the first, fixed trunk.  The movement of the second trunk relative to the first trunk is accomplished, at least in part, by the bracket's motion at its point of attachment, i.e., the "fixed point."  *See* '718 patent, col. 7 ll. 52–59 (describing the bracket as pivotably attached to the fixed trunk portion, and as either fixed or pivotably attached to the movable trunk).  Therefore, in Figure 18 "the first and second trunk portions are attached in a way that allows motion on a fixed point," satisfying the district court's claim construction.  *Frontgate*, 2016 WL 8346172 at \*10.  Balsam's expert testimony thus does nothing to undermine the fact that the terms "pivot" and "pivoting" are used in their ordinary sense, as the district court properly recognized in its construction.

## III

Next, Balsam argues that, even if collateral estoppel applied to the Frontgate Order, or we found no error in the Frontgate constructions, summary judgment of non-infringement must still be reversed because the district court misapplied or erroneously modified its construction of the "pivot" claim terms to require a direct connection between the first and second trunks.

In its decision granting UCP's motion for summary judgment of non-infringement, the district court found Balsam's expert's declaration unpersuasive, and therefore incapable of raising a genuine issue of material fact, because it was "inconsistent with the express language and meaning of the Frontgate Order." *Balsam II*, 2017 WL 5068568 at \*4.  According to the district court, "[b]y describing the 'fixed center on the slotted plate' as consistent with the required 'fixed point' of a 'pivot joint,' McCarthy ignore[d] that the second trunk must be connected to the fixed point." *Id.*  The district court explained that "[i]f there is no connection between the fixed point and the second trunk, it is

impossible for the trunk to 'turn[] on a fixed point." *Id.* Because there was "no connection between the fixed center of the slotted plate and the second trunk," the district court found that the Accused Product could not meet the "pivot joint" limitation as it was construed in the Frontgate Order. *Id.*

By requiring that there be a connection between the second trunk and the fixed point, and by finding that there existed no connection in the accused device, Balsam argues that the district court implicitly added a requirement to the Frontgate construction that the second trunk be not just connected to the fixed point, but directly connected to that point. We agree.

In Dr. McCarthy's declaration in support of Balsam's opposition to UCP's motion for summary judgment, he identified a fixed point on the first trunk of the Accused Product to which a "slotted plate" is attached. J.A. 1142. The second trunk is then attached to that slotted plate with a "bracket" and "pins." J.A. 1145. Thus, the second trunk does appear to be connected to the fixed point, albeit indirectly. The district court therefore must have required a direct connection between the fixed point and the second trunk in order to find, without further analysis, that there existed "no connection between the fixed center of the slotted plate and the second trunk." *Balsam II*, 2017 WL 5068568 at *4.

UCP argues in response that the district court's construction of "pivot joint" always required a direct connection between the second trunk and the fixed point. UCP supports its argument by pointing to Frontgate's proposed construction of "pivot joint," which required "a mechanical connection between the first trunk and the second trunk from which the second trunk moves *in a circle around a fixed point.*" *Frontgate*, 2016 WL 8346172 at *3. According to UCP, the district court modified Frontgate's proposed construction to include the language "turns on a fixed

point" for the specific purpose of requiring a direct connection between the second trunk and the fixed point. It claims therefore that the district court did not modify its construction at the summary judgment stage, and because collateral estoppel applies to the Frontgate Order, we should not consider Balsam's arguments on this point. The record, however, does not support UCP's argument.

Prior to issuing the Frontgate Order, the district court issued a tentative claim construction ruling to focus the parties' arguments. Frontgate proposed the following construction for "pivot joint": "A joint allowing pivoting of the second trunk relative to the first trunk by a mechanical connection between the first trunk and the second trunk from which the second trunk moves in a circle around a fixed point." Frontgate Litigation, ECF No. 106. The court, tentatively adopting a slightly modified version of Frontgate's construction, construed the "pivot joint" term as "[a] joint allowing turning of the second trunk relative to the first trunk by a mechanical connection between the first trunk and the second trunk from which the second trunk moves around a fixed point, changing the angle between the first trunk and the second trunk along their lengths." *Id.*

At the claim construction hearing, Frontgate took issue with the district court's decision to remove the phrase "in a circle" from Frontgate's proposed construction. Frontgate argued that the "pivot joint" claims were "structural claim[s]" that required "a physical pivot." J.A. 3947. It noted additionally that the "pivot joint" claims included a "functional limitation" in that the "pivot joint" must "allow[] pivoting of the second trunk relative to the first trunk." J.A. 3949. According to Frontgate, "movement around a fixed point when it's pivoting is defined by a circle." J.A. 3947. Thus, removing "in a circle" created a possible ambiguity, according to Frontgate, that the movement of the two trunks relative to each other could encompass movement other than pivoting. Frontgate

explained that the court did not need to include the phrase "in a circle" so long as its construction indicated by some other means that the two trunks were pivoting relative to each other. Frontgate suggested that the phrase "on a fixed point" alleviated the problem created by the district court's tentative construction because it would require an attachment between the fixed point and the second trunk such that the movement of the second trunk would be confined to circular movement around the fixed point. The district court adopted Frontgate's suggestion in its final construction.

In the Frontgate Order, the district court recognized that the patents' specification described the invention as including "at least one second trunk . . . portion pivotably attached to the first trunk portion, at least indirectly, through at least one pivot joint." '718 patent, col. 2 ll. 17–21. The district court did not, however, find that the indirect attachment disclosure undermined its proposed "on a fixed point" construction because it said "nothing about the sort of motion allowed by the pivot joint." *Frontgate*, 2016 WL 8346172 at *10. According to the district court, even in the case of an indirect attachment, the second trunk was still "pivotably attached . . . through a pivot joint," and thus the trunks were still attached "in a way that allow[ed] for motion on a fixed point," as required by the district court's construction. *Id.*

It is therefore clear that, in adopting a construction of "pivot joint" that included "turn[ing] on a fixed point," the Frontgate court never intended that construction to limit the type of attachment between the first and second trunks to a direct attachment. Instead, based on the arguments made during the claim construction hearing and the court's analysis in the Frontgate Order, it appears that the "on a fixed point" language was adopted to ensure that the movement at the "pivot joint" was restricted to pivoting, as opposed to other types of rotational movement. Because the direct connection requirement was added to the

construction of "pivot joint" at summary judgment, collateral estoppel—assuming without deciding that it applies to the Frontgate Order—does not preclude Balsam from challenging that new requirement.

Now that we have determined that the district court modified the original construction of "pivot joint" laid out in the Frontgate Order, we must analyze whether the district court committed error in adopting that modified construction. We review a modification to a court's prior construction the same way we review the original construction: de novo. *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1556 (Fed. Cir. 1995) ("No matter when or how a judge performs the *Markman* task, on appeal we review the issue of claim interpretation independently without deference to the trial judge.").

The intrinsic evidence here is dispositive. As the district court itself recognized, the Patents-in-Suit's specification explicitly contemplates an indirect connection between the first and second trunks. *See* '718 patent, col. 2 ll. 17–20 ("[T]he trunk includes at least two trunk portions including a first trunk portion adapted to be supported above a floor and at least one second trunk portion pivotably attached to the first trunk portion, at least indirectly, through at least one pivot joint."); *id.* col. 7 ll. 52–56 ("FIGS. 18 and 19 depict . . . a bracket 138 pivotably attached to the upper end 34 of the fixed trunk 30 and an end of the bracket 138 opposite the upper end 34 of the fixed trunk 30 either fixed or pivotably attached to the rotating trunk."). We thus find error in the district court's implicit direct connection requirement because it runs counter to the intrinsic evidence.

As we mentioned above, the slotted plate and the pins in the accused device appear to provide an indirect connection between the second trunk and a fixed point where the slotted plate is fastened to the first trunk. We therefore must vacate the district court's finding of no literal

infringement and remand the case for a determination of whether the Accused Product meets the "pivot" claim limitations as those limitations were construed in the Frontgate Order without the erroneous direct connection modification added at summary judgment.

## IV

Last, Balsam contends that the district court erred in granting summary judgment of non-infringement under the doctrine of equivalents. Balsam argues that it presented sufficient evidence from which a reasonable factfinder could find the "pivot" claim limitations met under the doctrine of equivalents. Because we find error in the district court's modified construction of "pivot joint" at summary judgment, and because it is not clear to us how that error may have affected the court's doctrine of equivalent's analysis, we must also vacate the district court's finding of no infringement under the doctrine of equivalents and remand for proceedings consistent with this opinion.

## CONCLUSION

For the reasons stated above, we hold that the district court erred in its modified construction of "pivot joint" at summary judgment. We therefore vacate the district court's determination that the Accused Product does not infringe, either literally or under the doctrine of equivalents, the asserted claims of the Patents-in-Suit. We remand the case for proceedings consistent with this opinion.

## VACATED AND REMANDED

### COSTS

No costs.